Barry Himmelstein (SBN 157736)
barry@himmellaw.com
HIMMELSTEIN LAW NETWORK
2000 Powell St., Suite 1605
Emeryville, CA 94608-1861
Telephone:  (510) 450-0782
Facsimile:  (510) 924-0403

*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MICHAEL RYAN, MARCO GARZA, MICHAEL AGUERO, ODELL COWANS, BRETT ERION, RUSS RUHNKE, THOMAS KORVES, LUIS FLORES, STEVEN BERGER, ELIGIO TORRES, and ROBERT BAKER, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>GENCOR NUTRIENTS, INC.; GE NUTRIENTS, INC.; JITH VEERAVALLI; GENERAL NUTRITION CORPORATION; GNC CORPORATION; GENERAL NUTRITION CENTERS, INC.; S&G PROPERTIES, LLC; DIRECT DIGITAL LLC; TRUDERMA, LLC; FORCE FACTOR LLC; NAC MARKETING COMPANY, LLC; KINGFISHER MEDIA, LLC; DREAMBRANDS, INC.; PHARMAFREAK HOLDINGS INC.; NDS NUTRITION PRODUCTS, INC.; MEDICAL RESEARCH INSTITUTE, INC.; PREVENTION, LLC; | Case No.: 2:15-cv-01209-DMG-E<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1

PREMIUM NUTRACEUTICALS,           )
LLC; MICHAEL D. GARDINEER;        )
and DOES 1-100,                   )
                                  )
                Defendants.       )
_____ )

Plaintiffs RUSS RUHNKE and ELIGIO TORRES, on behalf of themselves and all others similarly situated, allege as follows:

## SUMMARY OF ACTION

1.    Defendants manufacture, market, and sell nutritional supplements containing Testofen, an extract of the herb fenugreek manufactured by Gencor Nutrients, Inc. ("Gencor"). Defendants advertise and market these products as "testosterone boosters," representing that Testofen has been "clinically proven" to increase free testosterone levels, and that Testofen increases muscle size and strength. These representations are false, and Plaintiffs and the other members of the Classes (as defined below), who purchased these products based on these false representations are entitled to get their money back.

## JURISDICTION

2.    This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), in that members of the proposed plaintiff class are citizens of a State different from one or more defendants, and the amount in controversy exceeds the sum of $5,000,000.

## PARTIES

3.    Plaintiff RUSS RUHNKE ("Ruhnke") is an individual residing in Orange County, California.

4.    Plaintiff ELIGIO TORRES ("Torres") is an individual residing in Maricopa County, Arizona.

First Amended Class Action Complaint

5.     Defendant TRUDERMA, LLC ("Truderma") is a Nevada limited liability company having its principal place of business in Las Vegas, Nevada. Truderma manufactures and sells Troxyphen and Troxyphen Elite, which contain Testofen.

6.     Defendant MICHAEL D. GARDINEER ("Gardineer") is an individual residing in Las Vegas, Nevada.  Gardineer is, and at all relevant times was, the Managing Member of Truderma.

7.     Defendant NDS NUTRITION PRODUCTS, INC. ("NDS") is a Florida corporation having its principal place of business in Omaha, Nebraska. NDS manufactures and sells PMD N-TEST 600, which contains Testofen, and PMD Flex Stack, which includes PMD N-TEST 600.

8.     Plaintiffs are ignorant of the true names and capacities of the defendants sued herein under the fictitious names Does 1 through 100.  Each of the fictitiously named defendants is responsible in some manner for the acts herein alleged, and proximately caused Plaintiffs' damages.  Plaintiffs will seek leave of court to amend this complaint to allege said defendants' true names and capacities as soon as Plaintiffs ascertain them.

## COMMON FACTUAL ALLEGATIONS

### I.     Representations Concerning Testofen

9.     Gencor's website, www.gencorpacific.com, states that its mission is to "support changing human health needs across the lifespan through innovative, clinically proven ingredients," and that "Our herbal ingredients have been clinically studied and shown effective in both animal and human clinical trials."

10.    One of the herbal ingredients manufactured and sold by Gencor is Testofen, a standardized extract of the herb Trigonella foenum-graecum, commonly known as fenugreek.  The name of the product, Testofen, is an

First Amended Class Action Complaint

amalgamation of the words "testosterone" and "fenugreek."  Gencor sells Testofen to manufacturers of nutritional supplements, including the other defendants named herein, for inclusion in their products, which are marketed and sold as clinically-proven "testosterone boosters."

11. On the page devoted to Testofen (Exh. 1), Gencor's website states that:

> Testofen is the branded name for Gencor's fenugreek extract. Fenugreek is a well-known, versatile herb that contains over 100 phytochemical constituents, including Furostanol Saponins and Steroidal Saponins.  While fenugreek has multiple health applications, the active constituents included in Testofen have been shown to boost testosterone levels and thereby increase libido, lean muscle mass and immune functions.  The group of saponin glycosides that Testofen is standardized to is named Fenuside.
>
> After age 30, most men begin to experience a natural and gradual decline in testosterone levels, which can result in reduced drive and libido and a slow loss of muscle tone and definition.  Most of the testosterone found in men is bound to the Sex Hormone Binding Globulin (SHBG) and Albumin. Only 2−3% of the testosterone present in the human body is typically in a free state.
>
> Testofen has been shown to increase free testosterone, up to 98 percent, in an eight-week trial (see below).

12. Under the heading "Clinical research," Gencor's website states:

> **Human study on free testosterone levels and performance**
>
> **Study Results:** A double-blind, randomized, placebo-controlled human clinical study of 60 subjects was conducted using Testofen as the sole ingredient.  The active group demonstrated the following statistically significant results:
>
> - Significant increase in free testosterone ($p<0.05$) compared to placebo group
>
> **Citation:**  Wankhede et. al., 2006 "Effect of Testofen on safety, anabolic activity and factors affecting exercise physiology."  To be published.

4

First Amended Class Action Complaint

13.     Below the citation to "Wankhede et al." (hereafter, the "Testofen Study") is a link for visitors to "Request Complete Study," which generates a pop-up window stating:  "To request the complete study document in PDF format please enter your email address below."  Such requests are consistently ignored by Gencor.

14.     Based on the foregoing, the website makes the "Approved health claim" that Testofen "**Increases free testosterone levels.**"

15.     The website also makes the "Approved health claims" that Testofen "**Increases muscle mass**" and "**Supports lipolysis (reduction in body fat)**."

16.     The website features a video of Gencor's Chief Scientific Advisor, Paul Clayton, Ph.D. (available at http://www.youtube.com/embed/NL_4G13Y1is?autoplay=1), whom Gencor describes as "the UK's leading expert in the fast-developing science of pharmaco-nutrition."  In the video, Dr. Clayton states that Testofen:

> results in approximately a doubling of free testosterone levels.  Now that's important because as we get older, and as we get more stressed, more tired by the constant demands of work and life in general, very often testosterone levels fall, and as they do we experience a loss of libido, of drive, muscle tone as well, because testosterone is very important in building muscles.  By taking Testofen and achieving a doubling of free testosterone levels all of these adverse changes are reversed . . . .

## II.     Statistical Principles for Clinical Trials

17.     The International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use ("ICH") *Harmonised Tripartite Guideline, Statistical Principles For Clinical Trials, E9* (Feb. 4, 1998) (the "ICH Guideline") sets forth principles for the statistical analysis of human clinical trials that have been adopted by the regulatory bodies of the European Union, Japan, and the United States, including the U.S.

Department of Health and Human Services, Food and Drug Administration's

("FDA's") Center for Drug Evaluation and Research and Center for Biologics

Evaluation and Research.  The ICH Guideline is available on the FDA's website

at

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformati

on/Guidances/UCM073137.pdf.

### A.  Exploratory Studies and Confirmatory Trials

18.  The ICH Guideline explains the difference between an

"exploratory study" and a "confirmatory trial" as follows:

> A confirmatory trial is an adequately controlled trial in which the hypotheses are stated in advance and evaluated.  As a rule, confirmatory trials are necessary to provide firm evidence of efficacy or safety.  In such trials **the key hypothesis of interest follows directly from the trial's primary objective, is always pre-defined, and is the hypothesis that is subsequently tested when the trial is complete.**  [Section 2.1.2 (emphasis added).]

> The rationale and design of confirmatory trials nearly always rests on earlier clinical work carried out in a series of exploratory studies.  Like all clinical trials, these exploratory studies should have clear and precise objectives.  However, in contrast to confirmatory trials, their objectives may not always lead to simple tests of pre-defined hypotheses.  . . . **Such trials cannot be the basis of the formal proof of efficacy**, although they may contribute to the total body of relevant evidence.  [Section 2.1.3 (emphasis added).]

### B.  Primary and Secondary Variables

19.  The ICH Guideline explains the difference between a "primary

variable" or "endpoint," and a "secondary variable" as follows:

> The primary variable ('target' variable, primary endpoint) should be the variable capable of providing the most clinically relevant and convincing evidence directly related to the primary objective of the trial.  **There should generally be only one primary variable.**

> To avoid multiplicity concerns arising from post hoc definitions, it is critical to specify in the protocol the

precise definition of the primary variable as it will be used in the statistical analysis.

Redefinition of the primary variable after unblinding will almost always be unacceptable, since the biases this introduces are difficult to assess.  When the clinical effect defined by the primary objective is to be measured in more than one way, the protocol should identify one of the measurements as the primary variable on the basis of clinical relevance, importance, objectivity, and/or other relevant characteristics, whenever such selection is feasible.

Secondary variables are either supportive measurements related to the primary objective or measurements of effects related to the secondary objectives.  [Section 2.22 (emphasis added).]

C.   **Multiplicity**

20.    In human clinical trials for efficacy, statistical significance is established by having a probability or "p" value of less than 0.05, usually expressed as "$p < 0.05$."  In layman's terms, this means that there is less than a 5% (one in twenty) probability that the observed difference in the primary variable between the treatment and placebo or other control group is due to chance.  The greater the number of variables being analyzed from a single trial, the greater the likelihood of a false positive result, called "Type I error" in statistical parlance, unless corrective statistical techniques are applied.  That is, if each statistical test has a 5% chance of producing a false positive, then the overall chances of *some* false positive amongst *multiple* tests will be much greater than 5%.  This is often denoted as the "family-wise Type I error rate," where "family" refers to the set, or family, of hypotheses being considered.

21.    To illustrate, imagine you had a roulette wheel with only 20 pockets in which the ball could land, instead of the usual 38.  Place a bet on any single number – a single primary variable, if you will – and the odds that the ball will land in the corresponding pocket, producing a winner, are 1 in 20.  Place bets on *two* numbers – two primary variables, if you will – and the odds that the ball will

7

First Amended Class Action Complaint

land in *one* of the corresponding pockets, producing a winner, are 1 in 10, not 1 in 20.

22.     This problem is known generally as "multiplicity."  *See* ICH Guideline, Section 2.2.5 ("It may sometimes be desirable to use more than one primary variable . . . . The effect on the Type I error should be explained because of the potential for multiplicity problems (*see* Section 5.6); the method of controlling type I error should be given in the protocol.").  As the ICH Guideline explains:

> When multiplicity is present, the usual frequentist approach to the analysis of clinical trial data may necessitate an adjustment to the type I error.  Multiplicity may arise, for example, from multiple primary variables (see Section 2.2.2) . . . . Methods to avoid or reduce multiplicity are sometimes preferable when available, such as the identification of the key primary variable (multiple variables) . . . . In confirmatory analyses, any aspects of multiplicity that remain after steps of this kind have been taken should be identified in the protocol; adjustment should always be considered and the details of any adjustment procedure or an explanation of why adjustment is not thought to be necessary should be set out in the analysis plan.  [Section 5.6.]

23.     Testofen was developed by Indus Biotech Pvt. Ltd., which is located in India.  As one Indian medical journal recently explained:

> In most of the clinical trials published in Indian medical journals multiple end points are measured and hence multiple statistical tests are used to measure the difference between groups.  This may lead to increase in false positivity or Type I error.  The P value is based on principal of probability, if with one statistical test the chance of having a significant result is 5%, then after 20 statistical tests it may be more than 40%. This is called inflation of type 1 error.  More the number of statistical tests more inflation of Type 1 error.  Inflation of type 1 error can be prevented dividing the endpoints at the design phase itself into primary and secondary endpoints.  Most important endpoint should be considered as primary endpoint and other endpoints should be considered as secondary endpoints.  **If the primary endpoint cannot be restricted to one then multiple endpoints should be adjusted with the help of various adjustment methods**

8

First Amended Class Action Complaint

**like Bonferroni method, least significant difference test, composite endpoint method etc.**  In a study . . . done for clinical trials published in Indian medical journals it was found that **about one third of the clinical trials published in four Indian journals were false positive and statistical methods used to adjust this error was not mentioned in even a single trial**.

J. Charan, D. Saxena, *Suggested Statistical Reporting Guidelines for Clinical Trials Data*, Indian J Psychol Med 2012 Jan-Mar; 34(1): 25-29 (available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3361838/).

### D.    The Bonferroni Correction

*24.*    The simplest and most commonly used method of making such adjustments is known as the "Bonferroni correction."  The correction is based on the observation that, if $k$ tests are being evaluated separately, the family-wise Type I error rate is at most $k$ times 0.05 if each test uses a standard 0.05 significance level.  To obtain an overall significance level for the whole family of tests at a significance level of 0.05, the Bonferroni correction states that each individual test should be carried out using a significance level of 0.05$/k$.  *See* Wright, Adjusted p-values for simultaneous inference, *Biometrics*, 1992, 1005-1013.

*25.*    Accordingly, if there are two primary variables or endpoints, applying the Bonferroni correction, the threshold for statistical significance for each of the two variables is 0.025 (0.05/2).  If there are three primary variables, the threshold for statistical significance for each of the three variables is 0.016 (0.05/3), etc.

## III.    The Testofen Study

### A.    The Protocol

26.    The protocol for the Testofen Study, entitled "EFFECT OF IND 6 ON MUSCULAR STRENGTH, ENDURANCE AND BODY COMPOSITION," Project Code: IBHM05/2006, Test Formulation: IND6, dated May 24, 2006,

9

First Amended Class Action Complaint

sponsored by INDUS BIOTECH PVT LTD., Principal Investigator:  Dr. Sachin Wankhede, Pune (the "Protocol"), identifies it as an "exploratory study," stating that "This trial, being an exploratory study, no statistical method is applied to determine the sample size . . . ."  (Page 18, Section 9.)  **Such trials cannot be the basis of the formal proof of efficacy."**  ICH Guideline, Section 2.1.3.

27.     The Protocol defines the "PRIMARY OBJECTIVES" of the Study as:  (a) "To determine the effects of IND6 [Testofen] on muscle strength and endurance during eight weeks of resistance exercise;" and (b) "To evaluate safety of the test supplement."  (Page 7, Section 4.1.)

28.     The Protocol states that "Primary efficacy will be assessed on the basis of the following parameters" of "Muscular Strength and Endurance":  (a) "Change in 1-RM Bench Press;" (b) "Change in 1-RM Leg Extension;" (c) "Change in Bench Press repetitions at 80% of 1-RM at baseline;" and (d) "Change in Leg Extension repetitions at 80% of 1-RM at baseline."  (Page 14, Section 8.1.)

29.      The Protocol defines the "SECONDARY OBJECTIVES" of the Study as:  (a) "To determine the effects of the ingestion of IND6 on muscle size during eight weeks of resistance exercise." (b) "To determine the effects of the ingestion of IND6 on body composition during eight weeks of resistance exercise." and (c) **"To assess effect of IND6 on serum testosterone (total and free) and prolactin levels."**  (Page 7, Section 4.2.)

30.     Under the heading "CLINICAL EFFICACY ASSESSMENTS," the Protocol states that "Secondary efficacy will be assessed on the basis of the following parameters:  (a) Muscle size - (i) Change in thigh: maximal girth, inferior to the gluteal fold, (ii) Change in flexed arm: maximal girth at mid upper arm, elbow flexed and muscle contracted, (iii) Change in shoulders: across the

maximal protrusion of the deltoids, (iv) Change in chest: mid-tidal volume;" and (b) "Body Composition – (i) Change in Fat-Free Mass, (ii) Change in Percent Body Fat, (iii) Change in Fat Mass, and (iv) Change in Body Weight."  (Page 14, Section 8.1.)

31.    Under the heading "LABORATORY EFFICACY ASSESSMENTS," the Protocol states that "**Secondary efficacy will be assessed by measuring changes from baseline in serum testosterone (total and free) and prolactin levels after 8 weeks.**"  (Page 15, Section 8.3.)

32.    **Accordingly, as defined by the Protocol, determining the effect of Testofen on free testosterone levels was not the primary objective of the Testofen Study, but one of three secondary objectives, and free testosterone levels was not one of four primary variables noted, but one of at least three (and perhaps as many as ten) secondary variables.**

33.    Gencor has made publicly available three versions of the Testofen Study purporting to support its claim that Testofen has been clinically proven to increase free testosterone levels:  (1) a version entitled "Testofen Human Clinical Trial," Copyright 2006 by Gencor Pacific, Inc. (the "2006 Report") (Exh. 2); (2) a version entitled "Human Clinical Study for Free Testosterone & Muscle Mass Boosting," Copyright 2008 by Gencor Nutrients, Inc. (the "2008 Report") (Exh. 3); and (3) a duplicate of the 2008 Report, Copyright 2013 by GE Nutrients, Inc. (Exh. 4).

34.    Gencor has also provided Plaintiffs' counsel with:  (a) an undated and unpublished manuscript concerning the Testofen Study entitled "Beneficial effects of fenugreek glycosides supplementation in weight resistance trained male subjects: A prospective, double-blind, randomized, placebo controlled study" (the

"Manuscript"); and (b) an Excel spreadsheet containing the individual data points for the 60 subjects enrolled in the Testofen Study (the "Study Data").

### B.   The 2006 Report

35.    The 2006 Report identifies the Testofen Study as an exploratory study "designed to explore the efficacy and safety of TESTOFEN in healthy male volunteers," and states that "Primary objectives of the study were to determine the effects of TESTOFEN on free testosterone and body composition during eight weeks of resistance exercise and to evaluate safety of TESTOFEN."  (Page 2.)

36.    **As set forth above, effect on body composition and free testosterone levels were secondary, not primary objectives of the Testofen Study, and secondary, not primary variables.  The primary objective of the Testofen Study, to determine the effects of Testofen on muscle strength and endurance, and the primary efficacy measures (*see* Paragraph 63, above) are not mentioned in the 2006 Report.**

37.    The 2006 Report shows pre-treatment and post-treatment free testosterone levels for the Testofen group, but makes no claim of statistical significance.

38.    In addition to body composition measures, the 2006 Report presents blood urea nitrogen ("BUN") levels as a third variable.

39.    Under the heading "Safety," the 2006 Report lists 20 "biochemical parameters [that] were analyzed for the active and placebo groups," including "Creatinine" and "Lymphocytes," and states that "All of the parameters were normal for all participants."

### C.   **The 2008 Report**

40.   The 2008 Report identifies the "PRIMARY CLINICAL END POINTS" of the Testofen Study as "To determine the effect of TESTOFEN on Safety, Anabolic Activity, Blood Testosterone, Immune Function," and the "SECONDARY CLINICAL END POINTS" as "To determine the effects of TESTOFEN on body composition, Creatinine, Prolactin, and Muscle mass variation."  [Page 3.]

41.   The 2008 Report states that:

Primary efficacy was assessed on the basis of following parameters:

  I. Anabolic Activity by Nitrogen Absorption measured by BUN
  II. Blood testosterone both Total and Free
  III. Total Lymphocyte count and check immunity.  [Page 8.]

42.   The 2008 Report states that:

 Secondary efficacy will be assessed on the basis of following parameters:

  1. Exercise Physiology Biomarkers
   • Serum Creatinine
   • Serum Prolactin

  2. Body Composition
   • Change in Fat-Free Mass
   • Change in Percent Body Fat
   • Change in Fat Mass
   • Change in Body Weight

  3. Muscle size
   • Change in thigh: maximal girth, inferior to the gluteal fold.
   • Change in flexed arm: maximal girth at mid upper arm, elbow flexed and muscle contracted.
   • Change in shoulders: across the maximal protrusion of the deltoids.
   • Change in chest: mid-tidal volume.  [Page 8.]

43.   **As set forth above, the effect on free testosterone levels was a secondary, not primary objective of the Testofen Study, and free**

testosterone levels was one of numerous secondary variables. **The primary objective of the Testofen Study, to determine the effects of Testofen on muscle strength and endurance, and the primary efficacy measures (*see* Paragraph 63, above) are not mentioned in the 2008 Report.**

44.     The 2008 Report presents the results for the three purported "primary efficacy parameters," BUN, free testosterone, and lymphocytes, followed by the results for the purported "secondary efficacy parameters" creatinine, prolactin, body composition (three sub-measures), and muscle size (four sub-measures).  No results are presented for total testosterone, despite its inclusion in the list of "primary efficacy parameters."

45.     The 2008 Report presents the following results for free testosterone (pg/ml):

| PARAMETERS | TESTOFEN | PLACEBO | |
|---|---|---|---|
| Pre Treatment | 17.76 | 21.30 | |
| Post Treatment | 35.29 | 31.70 | |
| P value | 0.0001 | 0.014 | |
| Percentage change | 96 | 48 | P Value < 0.05 |

46.     Beneath these figures, the 2008 Report states:

> Although there is increase in both groups TESTOFEN group increase is double of Placebo.  After adjusting for plasma changes it is significant.  (p < 0.05).  Thus TESTOFEN group has shown significant increase with respect to base line (p < 0.0001) and with respect to placebo (p < 0.05).  [Page 9.]

47.     The 2008 Report concludes that the results are statistically significant as to *each of the three falsely-identified primary variables*, as well as *two of the four purported secondary variables*, as follows:

> 1.     TESTOFEN group has demonstrated significant anabolic activity as evidenced by BUN reduction (p<0.05) compared to placebo.

2.    **TESTOFEN group has significant increase in Free Testosterone (p<0.05) compared to Placebo.**

3.    TESTOFEN group has not only compensated the loss of Immunity significantly compared to Placebo (p<0.003), but has also increased immunity.

4.    TESTOFEN group has shown significant reduction in Serum Creatinine levels (p<0.02) compared to placebo signifying Creatine uptake and recycle in muscle cell.

5.    TESTOFEN group has shown significant increase in Prolactin compared to Placebo (p<0.04). However this increase is within Physiological limits for men. [Page 11 (emphasis added).]

48.    These claims of statistical significance include a number of measures not identified as either primary *or* secondary variables in the Protocol. Under the heading "LABORATORY SAFETY ASSESSMENTS," the Protocol provides:

> The Laboratory safety will be evaluated by recording routine laboratory test including biochemistry, haematology, and urinalysis tests at the initiation of treatment at the end of treatments.  (Hb, WBC: total and differential count, RBC count, platelet count, ESR, total bilirubin, SGOT, SGPT, alkaline phosphatase, LDH, serum proteins, urinalysis, blood urea nitrogen and creatinine)  (Page 15, Section 8.4.)

This section follows, and is separate from, the section entitled "LABORATORY EFFICACY ASSESSMENTS," clearly differentiating between the two.

49.    The 2008 Report states that "Primary efficacy was assessed on the basis of the following parameters: I. Anabolic Activity by Nitrogen Absorption measured by BUN" (Page 8), and that "TESTOFEN group has demonstrated significant anabolic activity as evidenced by BUN reduction (p < 0.05) compared to placebo."  (Page 11, Conclusion 1.)  BUN is not identified as either a primary or secondary efficacy measure in the Protocol, but as the **thirteenth of fourteen "routine laboratory test(s)."**  Thus, the 2008 Report represents that a "routine

15

First Amended Class Action Complaint

laboratory test" performed for safety was instead the first of three primary efficacy measures.

50.     The 2008 Report represents that the other two primary efficacy measures are "II. Blood Testosterone both Total and Free" (discussed above), and "III. Total Lymphocyte count and check immunity." (Page 8.) The 2008 Report states that "Testofen has a significant increase in Lymphocytes with respect to Placebo ($p < 0.03$)" (Page 9), from which the author(s) concludes that "TESTOFEN group has not only compensated the loss of Immunity significantly compared to Placebo ($p < 0.003$), but has also increased immunity." (Page 11, Conclusion 3.) There is no mention of lymphocyte count in the Protocol, as either a primary or secondary variable of interest, or even as one of the fourteen enumerated "routine laboratory tests." Lymphocytes are but one of the five types of white blood cells counted in the differential white blood cell (WBC) "routine laboratory test" called for by the Protocol. *See* http://www.nlm.nih.gov/medlineplus/ency/article/003657.htm.

51.     The 2008 Report identifies as a "SECONDARY CLINICAL END POINT" "To determine the effects of TESTOFEN on . . . Creatinine, . . ." (Page 3); states that "Secondary efficacy will be assessed on the basis of 1. Exercise Physiology Biomarkers – Serum Creatinine" (Page 8); and that "TESTOFEN group has shown significant reduction in Serum Creatinine levels ($p < 0.02$) compared to placebo signifying Creatinine uptake and recycle in muscle cell." (Page 11, Conclusion 4.) Creatinine is not identified as either a primary or secondary efficacy measure in the Protocol, but as the **last of fourteen "routine laboratory test(s)."**

52.     The 2008 Report concludes that "TESTOFEN group has shown significant increase in Prolactin compared to Placebo ($p < 0.04$)." (Page 11,

Conclusion 5.).  Prolactin is identified in the Protocol as a secondary outcome measure.

53.     **Thus, none of the first five claims of statistical significance made in the 2008 Report (BUN, free testosterone, lymphocyte count, creatinine, and prolactin) are identified as primary outcome measures in the Protocol; two (BUN and creatinine) are not identified as primary or secondary outcome measures, but as the thirteenth and fourteenth of fourteen "routine laboratory tests" which the Protocol itself expressly distinguishes from "laboratory efficacy assessments;" and one (lymphocyte count) is not mentioned in the Protocol at all.**

D.     <u>**The Manuscript**</u>

54.     The Manuscript identifies the aim of the Testofen Study as determining the "efficacy and safety [of Testofen] on physiological parameters related to muscle anabolism, androgenic hormones and body composition . . . ." (Page 1.)

55.     The Manuscript identifies the "efficacy outcome measures of study" as "markers of anabolic activity (serum creatinine and blood urea nitrogen (BUN) to measure nitrogen metabolism), body composition (skinfold thickness and % body fat), male androgenic hormone profile (total and free testosterone levels in blood), muscular strength and endurance (bench press and leg press) . . . ."  (Page 6, Section 2.4.)  **The Manuscript makes no distinctions whatsoever between primary or secondary objectives of the Testofen Study, or between primary and secondary efficacy measures.**  Indeed, neither the word "primary" nor "secondary" appears in the Manuscript.  The Protocol classifies creatinine and BUN as "routine laboratory tests," not efficacy measures.

First Amended Class Action Complaint

56.     As to the primary objective identified in the Protocol, effect on muscle strength and endurance, the Manuscript concludes that "no statistically significant difference [was] found between 1 RM-bench press, and or muscle endurance (Maximum repetitions) in leg press and bench press exercises."   (Page 7, Section 3.2.)

57.     The Manuscript also concludes that "The change in total testosterone from baseline was . . . not significant between the treatment groups."  (Page 7, Section 3.3.)

58.     As to the effect of Testofen on free testosterone levels, the Manuscript states that "The change in free testosterone from baseline (Fenu-FG: $17.53 \pm 8.55$; Placebo: $10.39 \pm 14.71$) was found significant between the groups at $P < 0.05$."  (Page 7.)

59.     The following table summarizes the shifting identification of the primary variables, secondary variables, and routine laboratory (*i.e.*, safety) tests, involved in the Testofen Study:

| Document | Primary Variable(s) | Secondary Variables | Safety |
|---|---|---|---|
| Protocol | Muscle Strength and Endurance | Muscle Size (4 sub-measures) Body Composition (4 sub-measures) Total testosterone Free testosterone Prolactin | WBC BUN Creatinine |
| 2006 Report | Free testosterone Body Composition (2 sub-measures) | BUN | Creatinine Lymphocytes |
| 2008 Report | BUN Total testosterone Free testosterone Lymphocytes | Creatinine Prolactin Body Composition (3 sub-measures) Muscle Size (4 sub-measures) | |
| Manuscript | Creatinine | | |

18

First Amended Class Action Complaint

| | BUN<br>Body Composition<br>(2 sub-measures)<br>Total testosterone<br>Free testosterone<br>Muscle Strength<br>and Endurance | | |
|---|---|---|---|

### E.     <u>The Results Are Not Statistically Significant</u>

60.     Plaintiffs have retained Professor Nicholas P. Jewell, a Professor of Biostatistics at the University of California, Berkeley, to determine whether Testofen has been clinically proven to increase free testosterone levels. Professor Jewell is the author of the textbook "Statistics for Epidemiology" (Chapman and Hall, New York 2003), as well as approximately 160 peer-reviewed articles in the field of biostatistics, and recently served as Chair of the Section on Statistics in Epidemiology of the American Statistical Association (2009-2012).

61.     Professor Jewell's expert report is attached as Exhibit 5. Professor Jewell has determined that Testofen has *not* been clinically proven to increase free testosterone levels, and that Defendants' claims to the contrary are *false*. In making this determination, Professor Jewell reviewed the Protocol, the 2006 Report, the 2008 Report, the Manuscript, and the Study Data. (Exh. 5 ¶ 7.)

62.     Professor Jewell summarized his conclusions as follows:

> According to the Protocol, determining the effect of Testofen on free testosterone levels was not the primary objective of the Study, and change in free testosterone levels was not included as one of at least twelve primary outcome variables, but rather one of at least three secondary outcome variables. Under universally accepted principles of statistical analysis, the threshold for statistical significance must be adjusted upward to reflect this multiplicity of comparisons. ***After making required adjustments, the results are not statistically significant with regard to free testosterone as claimed, regardless of the particular method of adjustment employed. Accordingly, the Claim is false.*** (Exh. 5 ¶ 8, emphasis added.)

63.     In particular, Professor Jewell explains that:

19

First Amended Class Action Complaint

A set forth above, in addition to the measurement and comparison of total and free testosterone, the Study includes primary efficacy measures of "muscular strength and endurance" (four sub-measures), and secondary efficacy measures of "muscle size" (four sub-measures), "body composition" (four sub-measures), and prolactin. Assuming, arguendo, that each of these sub-measures were perfectly correlated with one another, and that total testosterone, free testosterone, and prolactin levels were perfectly correlated (which is clearly not the case, as change in total testosterone levels is not significant even absent correction), the Bonferroni corrected significance level for each individual test would be $0.05/4 = 0.0125$. ***Even with these heroic assumptions, the nominal p-value of 0.030 demonstrated here, associated with comparing free testosterone changes across the Testofen and Placebo groups, is not statistically significant.***

While there are other, more sophisticated (and less conservative) methods to adjust for the problem of multiplicity, which may take into account the degree of correlation among the variables of interest, ***none produces a statistically significant result here for comparison of free testosterone changes across the two treatment groups***.  (Exh. 5 ¶¶ 48-49, emphasis added.)

64.     As Professor Jewell explains in the appended Supplemental Statement:

As stated in my Report, my "opinions, contained herein, are all stated to a reasonable degree of scientific certainty," although I "reserve[d] the right to supplement this preliminary report if new, or significantly modified, quantitative information is provided at any point." (Report, para. 5.)  It has been over a year since Gencor received my Report, but no "new or significantly modified quantitative information" has been provided. As my analysis was conducted on what Gencor represented was the full data set (the "Data"), I have no reason to believe that any such new or modified quantitative information exists.  My Report is and has been final, absent such new or modified information. (Exh. 5, Supplemental Statement ¶ 2.)

65.     In his Supplemental Statement, Professor Jewell reiterates his conclusion that "***Gencor's claim that Testofen produced a statistically significant increase in free testosterone levels in a clinical trial is false***."  (Exh. 5, Supplemental Statement ¶ 5, emphasis added.)

First Amended Class Action Complaint

F.      **The Published Study**

66.     In 2016, the results of the Testofen Study were published online, in the Journal of Sport and Health Science (Exh. 6) (the "Published Study").

67.     As set forth in the Protocol, the primary variable for the Testofen Study was muscle strength and endurance, using four measures:  (1) maximum strength in leg press ("1-RM-leg press"); (2) maximum strength in bench press ("1-RM-bench press"); (3) maximum repetitions to failure in leg press; and (4) maximum repetitions to failure in bench press.  As reported in the Published Study, *three of these four measurements showed no statistically significant difference between the Testofen and placebo groups*:

> "no statistically significant difference was found in 1-RM-bench press responses within the group (at the end of the study vs.  baseline) or between the groups (Fenu-FG vs.  placebo) at the end of the study."

> The increase found in 1-RM-leg press responses between the groups (Fenu-FG vs. placebo) was not statistically significant."

> "In case of repetitions to failure in leg press, no statistically significant difference was found within the groups (end of the study vs. baseline) or between the groups (Fenu-FG vs. placebo)."

> "The Fenu-FG treated group showed increase in repetitions to failure in bench press (by 1.59 +/- 1.11) whereas placebo group showed decrease (by 0.92 +/- 3.39). This difference (Fenu-FG = + 1.59 vs. placebo = −0.92) between the groups was statistically significant (p < 0.001)."

(Exh. 6, at 179-80.)

68.     This last claim of statistical significance is directly contradicted by the Manuscript, which unequivocally states that "no statistically significant difference [was] found between . . . muscle endurance (Maximum repetitions) in leg press and bench press exercises."   (Page 7, Section 3.2.)

69.     **Thus, it has been clinically proven that Testofen has no effect on muscle strength.**

70.     As set forth in the Protocol, a secondary variable was "body composition," measured by skinfold thickness and body fat.  As reported in the Published Study, there was no statistically significant difference in any of these measurements between the Testofen and placebo groups:

> "The decrease in skinfold thickness values or body fat between the groups (Fenu-FG vs. placebo) was not statistically significant."

(Exh. 6, at 180.)

71.     **Thus, it has been clinically proven that Testofen has no effect on skinfold thickness or body fat.**

72.     Although the Protocol also identifies change in muscle size (thigh, flexed arm, shoulder, and chest) as secondary variables, and this data was in fact collected and included in the Study Data, the results are not reported (or even acknowledged as a variable) in the Published Study, and are not statistically significant.

73.     The 2008 Report shows that there was no statistically significant increase in any of these muscle sizes, and that the thigh and shoulder muscles were actually *smaller* at the end of the trial than they were at the beginning. (Exh. 3 at 11; Exh. 4 at 11.)

74.     **Thus, it has been clinically proven that Testofen has no effect on muscle size.**

## IV.     Other Negative Studies

75.     In addition to the Testofen Study, at least three other studies sponsored by Indus Biotech have found that fenugreek extract has *no effect* on free testosterone levels.

76.     A human clinical trial conducted in Australia comparing Testofen to placebo found that Testofen "did not affect testosterone" levels.  E. Steels, *et al.*,

Physiological Aspects of Male Libido Enhanced by Standardized *Trigonella foenum-graecum* Extract and Mineral Formulation, *Phytotherapy Res.* 25: 1294-1300 (2011) (Exh. 7).

77.    Another study, sponsored by Indus Biotech, concluded that fenugreek extract has *no effect* on free testosterone levels:

78.    Despite no substantiated claims in human research models, fenugreek has been marketed in dietary products as having anabolic potential for resistance trained athletes. . . . The purpose of this study was to investigate the potential anabolic effects of fenugreek extract supplementation in conjunction with a controlled resistance training program. . . . No significant effects for groups or interactions were observed for the anabolic hormone[] free testosterone . . . ($p<0.05$). . . . [S]upplementation of fenugreek extract does not appear to affect hormonal status in resistance trained males and shows no anabolic potential as has been purported.  This study was supported by INDUS BIOTECH.

79.    B. Bushey, *et al*., Fenugreek Extract Supplementation Has No Effect on the Hormonal Profile of Resistance-Trained Males, *Int. J. Exerc. Sci.* 2(1): S13, 2009 (Exh. 8).

80.    Another study, also sponsored by Indus Biotech, also concluded that fenugreek extract has no effect on free testosterone levels.  *See* C. Poole, *et al*., Effects of TESTOSURGE supplementation on strength, body composition and hormonal profiles during an 8-week resistance training program, *J. Int. Soc. Sports Nutrition* 2009, 6(Suppl. I): P12 ("No significant changes were detected among groups for . . . free testosterone") (Exh. 9).

81.    Yet another study, also sponsored by Indus Biotech, found a significant difference in free testosterone levels between the group taking fenugreek extract and the placebo group, but the difference was *in favor of the*

*placebo group*, whose free testosterone levels rose by an average of 10 ng/ml over the course of the study, compared to the fenugreek group, whose free testosterone levels *declined* by an average of 4 ng/ml.  C. Poole, *et al*., The effects of a commercially available botanical supplement on strength, body composition, power output, and hormonal profiles in resistance-trained males, *J. Int. Soc. Sports Nutrition* 2010, 7:34 (Table 5) (Exh. 10).  Rather than finding a *negative* effect on free testosterone levels, the study concluded that fenugreek extract has *no* effect:

> Fenugreek supplementation is surrounded by assertions of having anabolic potential, even though there is no scientific data supporting this notion.  In the present study we examined serum hormone variables that included free testosterone . . . . Although a between group difference was noted for free testosterone at T2 and T3, it has limited relevance due to the fact that it did not significantly change over time. . . . [D]aily consumption of the 500 mg commercially available [fenugreek] supplement in conjunction with a resistance training program has no anabolic effect on the hormonal status of resistance trained males.  [Page 8.]

## V.   All Products Containing Testofen Are "Adulterated"

82.   Testofen is a "new dietary ingredient" as defined by 21 U.S.C. § 350b, and all products containing Testofen are therefore deemed "adulterated" and may not lawfully be sold due to Defendants' failure to provide the required premarket notification.  *See* 21 CFR § 190.6; 62 Fed. Reg. 49886.

## VI.   False Representations Concerning "Testosterone Boosters"

83.   Despite the fact that Testofen has *not* been shown to increase free testosterone levels, and the existence of *four published studies* showing that it has no such effect, the following products containing Testofen are marketed and sold as clinically proven "testosterone boosters."  False representations concerning each of these products are set forth below.

### A.   Troxyphen
#### 1.   Label and Packaging

84.     The label and packaging for Troxyphen (Exh. 11) describe it as "A unique [weight loss] supplement designed to specifically address the underlying cause of male weight gain:  LOW TESTOSTERONE," and state that it contains "INGREDIENTS SHOWN TO HELP:  RAISE TESTOSTERONE, BUILD LEAN MUSCLE."  The remainder of the packaging is devoted to drawing a link between "Low Testosterone and Excess Fat," and states that Troxyphen is "designed to specifically address the underlying cause of male weight gain.  By naturally and significantly increasing your base line testosterone levels . . . ."

85.     The label and packaging for Troxyphen Elite (Exh. 12) state that it is "A Powerful Free Testosterone Booster" containing "INGREDIENTS SHOWN TO HELP:  RAISE FREE TEST LEVELS, BUILD LEAN MUSCLE, DECREASE BODY FAT" and that "TROXYPHEN ELITE helps to increase your free testosterone levels . . . ."

#### 2.   Radio

86.     Troxyphen is the subject of a national radio advertising campaign, on both broadcast and satellite radio, including stations such as CNN.  The radio commercial, which has aired thousands of times, states that "Troxyphen is GNC's best-selling, 100% natural and most powerful testosterone booster.  Troxyphen raises testosterone . . . ."  The commercial states that "Troxyphen is available nationwide at GNC stores," and also directs listeners to the website, "stoplowt.com" or "raisemytest.com."

#### 3.   Websites

87.     The websites stoplowt.com and raisemytest.com (which is redirected to the website www.troxyphen2.com) (Exh. 13) state:

TROXYPHEN

25

ADVANCED TESTOGENIC
TESTOSTERONE BOOSTING THERMOGENIC
BURN EXCESS FAT
GAIN MUSCLE MASS

TROXYPHEN IS AN ADVANCED
SUPPLEMENT
DESIGNED TO BOOST FREE
TESTOSTERONE LEVELS WHILE BURNING
FAT

TESTOSTERONE INCREASED 98%

INCREASE LEAN MUSCLE MASS

By naturally and significantly increasing your base
line testosterone levels . . .

TROXYPHEN IS SAFE & CLINICALLY
RESEARCHED
TROXYPHEN was developed around the
clinically researched and patented Testofen.

TESTOSTERONE BOOSTING BLEND
The patented test boosting blend was shown in
clinical studies to:
RAISE TESTOSTERONE LEVELS 98.81% IN 8
WEEKS

TESTOFEN
Testofen is a natural solution for promoting
Healthy Free Testosterone levels . . .

THE CHOICE IS YOURS!
DO NOTHING AND GET
Lowering Testosterone Levels
Loss of Muscle Mass
A Growing Waistline

PICK TROXYPHEN AND ENJOY
Increased Testosterone Levels by 98%
Gains in Muscle Size & Strength
Loss of Stubborn "Man Fat"

88.     Truderma's website, Truderma.com (Exh. 14) states that Troxyphen

"Boost[s] Testosterone Levels by 313%" and "Increase[s] Fat Loss by 224% in 8

Weeks!"

First Amended Class Action Complaint

89.     Truderma's website, Truderma.com (Exh. 14) states that Troxyphen Elite "Boost[s] Testosterone Levels 313%" and "Increase[s] Bench Press by 114%."

**B.      PMD N-TEST 600/Flex Stack**

      **1.      Label and packaging**

90.     The packaging for PMD Flex Stack (Exh. 15), which contains a bottle of PMD N-TEST 600, states:

> **Natural Testosterone Booster:**  N-TEST 600 is fully jacked with 600 mg of Testofen, the clinically studied amount necessary to increase free flow testosterone levels up to 98%.*. Because N-TEST increases testosterone levels naturally versus synthetically, it provides all the positive bodybuilding results without the negative androgenic and estrogen-related side effects.*

> These key anabolic-inducing compounds synergistically help to produce extreme and potent results in increased strength, size, lean muscle mass, and muscle hardness.

> DYNAMIC RESULTS WITH TESTOFEN!

> Clinically Studied*
> **Testofen**

> 98% INCREASE IN FREE TESTOSTERONE

> *Effect of Testofen on safety, anabolic activity and factors affecting exercise physiology.  Copyright by Gencor Nutrients, Inc.

91.     The label for PMD N-TEST 600 (Exh. 16) states:

> INSANE TESTOSTERONE BOOST

> 600 mg of
> **Testofen**
> Clinically Proven Amount*

> Increase Free Testosterone Levels Up to 98%*
> With 600 mg of Clinically Studied Testofen

> *Effect of Testofen on safety, anabolic activity and factors affecting exercise physiology.  Copyright 2008 by Gencor Nutrients, Inc.

> Increased Muscle Mass

First Amended Class Action Complaint

Muscle Strength & Hardness

## 2.   Website

92.   The website www.ndsnutrition.com is owned by defendant NDS. The website (Exh. 17) states:

> N-TEST 600 is a strong natural testosterone booster fully loaded with 600 mg of Testofen, the clinically studied amount necessary to increase free testosterone levels up to 98%†

> †Effect of Testofen on safety, anabolic activity and factors affecting exercise physiology.  Copyright 2008 by Gencor Nutrients, Inc.

> Because N-TEST 600's formula increases testosterone levels naturally versus synthetically, it provides all the positive anabolic results (strength and size) without the negative androgenic and estrogen-related side affects [sic].

> increase lean muscle mass, strength, muscle hardness

## VII.   Plaintiffs' Purchases of "Testosterone Boosters"

93.   Plaintiff Ruhnke purchased two bottles of PMD N-TEST 600 at a GNC retail location in Mission Viejo, California, at the retail price of approximately $119.99 each, in 2014.

94.   Plaintiff Torres purchased a bottle of Troxyphen at a GNC retail location in Phoenix, Arizona, at the retail price of approximately $59.99, in early 2014.

95.   Plaintiff Torres purchased a bottle of Troxyphen Elite at a GNC retail location in Phoenix, Arizona, at the retail price of approximately $69.99, in early 2014.

96.   In making their purchases, Plaintiffs relied on the representations on the product label and packaging, set forth above, that the product they purchased was clinically proven to increase free testosterone levels, decreases body fat, and increases strength and muscle mass.  Each of these representations were false.

## CLASS ACTION ALLEGATIONS

28

First Amended Class Action Complaint

97.     Plaintiff Torres brings this action on behalf of himself and a Troxyphen Class, defined as all persons who purchased Troxyphen or Troxyphen Elite (the "Troxyphen Class").

98.     Plaintiff Ruhnke brings this action on behalf of himself and a PMD Class, defined as all persons who purchased PMD N-TEST 600 or PMD Flex Stack (the "PMD Class").

99.     The Troxyphen Class and PMD Class are collectively referred to herein as the "Classes," and the products included in the Classes are collectively referred to herein as "Testosterone Boosters."

100.    Excluded from the Classes are the officers, directors, and employees of any Defendant, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

101.    Certification of the Classes is sought pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

102.    While Defendants have not made sales figures publicly available, the Classes each have many thousands of members, and are so numerous that joinder of all members is impracticable.

103.    There are numerous questions of fact and law common to the members of the Classes which predominate over any questions affecting only individual members, including, without limitation:  (a) whether Testofen has been clinically proven to increase free testosterone levels; (b) whether Testofen increases muscle strength; (c) whether Testofen increases muscle size; (d) whether Defendants knew that these representations were false; (e) whether Defendants made these representations without a sufficient basis to believe that they were true; (f) whether Defendants expressly warranted that Testosterone Boosters increase free testosterone levels; (g) whether Testosterone Boosters fail

to conform to such express warranty, or the implied warranties of merchantability and fitness for a particular purpose; (g) whether Defendants' conduct violates Cal. Civ. Code § 1770(a)(2), (5), and/or (7); (h) whether Defendants' conduct constitutes fraudulent business acts or practices and/or deceptive, untrue, and misleading advertising in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; and (i) whether Defendants engaged in false advertising in violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

104.   Plaintiffs' claims are typical of the claims of the Classes they seek to represent, as Defendants' liability to each member of the Class is predicated on the same material misrepresentations.

105.   Plaintiffs will fairly and adequately protect the interests of the Classes, as they have no conflicts of interest with the other members of the Class, and have retained counsel experienced in complex consumer class actions.

106.   The prosecution of separate actions by individual members of each Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

107.   Defendants have acted on grounds that apply generally to the Classes, so that final injunctive and declaratory relief is appropriate respecting the Classes as a whole.

108.   A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that the costs of litigation would likely exceed the potential recovery by individual members of each Class, and there are no unusual difficulties in managing the litigation as a class action.

First Amended Class Action Complaint

### FIRST CLAIM FOR RELIEF
### VIOLATIONS OF CONSUMER LEGAL REMEDIES ACT

(Against NDS)

109.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

110.   Ruhnke and the other members of the PMD Class are "consumers" as defined in Cal. Civ. Code § 1761(d).

111.   The Testosterone Boosters purchased by Ruhnke and the other members of the PMD Class are "goods" as defined in Cal. Civ. Code § 1761(a).

112.   NDS' representations, set forth above, that Testosterone Boosters have been clinically proven to increase free testosterone levels are false, in violation of § 1770(a)(2), which proscribes "[m]isrepresenting the . . . approval, or certification of goods . . . ."

113.   NDS' representations, set forth above, that Testosterone Boosters have been clinically proven to increase free testosterone levels, that they decrease body fat, and that they increase muscle size and strength are false, in violation of § 1770(a)(5), which proscribes "[r]epresenting that goods . . . have . . . approval, characteristics, ingredients, uses, [or] benefits . . . which they do not have . . . ."

114.   NDS' representations, set forth above, that Testosterone Boosters have been clinically proven to increase free testosterone levels are false, in violation of § 1770(a)(7), which proscribes "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another."

115.   Pursuant to Cal. Civ. Code § 1780(a)(2), Plaintiffs seek an order enjoining NDS from the violations of Cal. Civ. Code § 1770(a)(2), (5), and (7) alleged herein.

116.   On May 15, 2014, NDS was served by certified mail, return receipt requested, at its principal place of business with the notice required by Cal. Civ.

Code § 1782(a), demanding that it cease the violations alleged herein, and restore to the members of the PMD Class all amounts paid for PMD N-TEST 600 and PMD Flex Stack.  NDS did not respond to or comply with the demands made in the notice within 30 days after its receipt.

117.   Pursuant to Cal. Civ. Code § 1780(a)(1) and (3), Ruhnke seeks actual damages and restitution against NDS, equal to the amounts paid for any Testosterone Booster by the members of the PMD Class.

118.   Pursuant to Cal. Civ. Code § 1780(a)(4), Ruhnke seeks punitive damages against NDS for representing that Testosterone Boosters are clinically proven to increase free testosterone levels, that they decrease body fat, and that they increase muscle size and strength, with knowledge of the falsity of those representations.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF UNFAIR COMPETITION LAW

### (Against NDS)

119.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

120.   NDS' false representations that Testosterone Boosters have been clinically proven to increase free testosterone levels, that they decrease body fat, and that they increase muscle size and strength, constitute fraudulent business acts or practices and deceptive, untrue, and misleading advertising in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

121.   NDS' representations would have been material to a reasonable person in deciding whether or not to purchase a Testosterone Booster.

122.   Ruhnke and the PMD Class justifiably relied upon NDS' representations by purchasing Testosterone Boosters.

First Amended Class Action Complaint

123.   NDS' violations of Cal. Civ. Code § 1770(a)(2), (5), and (7) alleged herein constitute unlawful business practices in violation of the Unfair Competition Law.

124.   As a result of NDS' violations, Ruhnke and the members of the PMD Class have suffered injury in fact and lost money.

125.   Pursuant to Cal. Bus. & Prof. Code § 17203, Ruhnke seeks an order enjoining these violations, and restoring the members of the PMD Class all amounts acquired by NDS as a result of these violations.

### THIRD CLAIM FOR RELIEF
### VIOLATIONS OF FALSE ADVERTISING LAW

(Against All Defendants)

126.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

127.   NDS' representations that Testosterone Boosters have been clinically proven to increase free testosterone levels are false.

128.   NDS' representations that Testosterone Boosters decrease body fat, and increase muscle size and strength, are false.

129.   NDS know, or in the exercise of reasonable care should know, that these representations are false.

130.   NDS made these representations with the intent to induce Ruhnke and the members of the PMD Class to purchase Testosterone Boosters.

131.   NDS' false representations induced Ruhnke and the members of the PMD Class to purchase Testosterone Boosters.

132.   NDS made or disseminated these representations, or caused them to be made or disseminated, before the public in the State of California, in the manner set forth above, including by television, radio, and over the internet, in violation of the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.

133.   NDS' representations that Testosterone Boosters have been clinically proven to increase free testosterone levels violate the express terms of Cal. Bus. & Prof. Code § 17508, which makes it "unlawful for any person doing business in California and advertising to consumers in California to make any false or misleading advertising claim, including claims that (1) purport to be based on factual, objective, or clinical evidence . . . ."

134.   As a result of these violations, Ruhnke and the members of the PMD Class have suffered injury in fact and lost money.

135.   Pursuant to Cal. Bus. & Prof. Code § 17535, Ruhnke seeks an order enjoining these violations, and restoring to the members of the PMD Class all amounts acquired by NDS as a result of these violations.

## FOURTH CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY

(Against All Defendants)

136.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

137.   Testosterone Boosters are goods.

138.   Plaintiffs and the other members of the Classes purchased Testosterone Boosters.

139.   Defendants' representations that Testosterone Boosters significantly increase free testosterone levels constituted an express warranty that Testosterone Boosters conformed to that affirmation or promise.

140.   The Testosterone Boosters purchased by Plaintiffs and the Classes did not, in fact, significantly increase their free testosterone levels, in breach of these express warranties.

First Amended Class Action Complaint

141.   Defendants' representations that Testosterone Boosters decrease body fat, and increase muscle size and strength, constituted express warranties that Testosterone Boosters conformed to those affirmations or promises.

142.   The Testosterone Boosters purchased by Plaintiffs and the Classes did not, in fact, decrease their body fat, or increase their muscle size or strength, in breach of these express warranties.

143.   As a direct and proximate result, Plaintiffs and the Classes have sustained damages equal to the amounts paid for Testosterone Boosters.

## FIFTH CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

(Against All Defendants)

144.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

145.   Testosterone Boosters are goods.

146.   Plaintiffs and the other members of the Classes purchased Testosterone Boosters.

147.   At all times relevant herein, Defendants were in the business of selling Testofen or Testosterone Boosters containing Testofen.

148.   The implied warranty or merchantability, implied in every contract for the sale of goods, includes the requirement that the goods conform to the promises or affirmations of fact made on the container or label.

149.   Testosterone Boosters do not conform to the promises or affirmations of fact made on the container or label, set forth above, that they significantly increase free testosterone levels, in breach of the implied warranty of merchantability.

150.   Testosterone Boosters do not conform to the promises or affirmations of fact made on the container or label, set forth above, that they

35

First Amended Class Action Complaint

decrease body fat, and increase muscle size and strength, in breach of the implied warranty of merchantability.

151.   Testosterone Boosters are "adulterated" and may not lawfully be sold, in breach of the implied warranty of merchantability.

152.   As a direct and proximate result, Plaintiffs and the Classes have sustained damages equal to the amounts paid for Testosterone Boosters.

**SIXTH CLAIM FOR RELIEF**
**BREACH OF IMPLIED WARRANTY**
**OF FITNESS FOR A PARTICULAR PURPOSE**

(Against All Defendants)

153.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

154.   Testosterone Boosters are goods.

155.   Plaintiffs and the other members of the Classes purchased Testosterone Boosters for the purpose of significantly increasing their free testosterone levels.

156.   At the time of purchase, Defendants knew or had reason to know that Plaintiffs and the other members of the Classes intended to use Testosterone Boosters for the purpose of significantly increasing their free testosterone levels.

157.   At the time of purchase, Defendants knew or had reason to know that Plaintiffs and the other members of the Classes were relying on their skill and judgment as manufacturers of nutritional supplements in formulating Testosterone Boosters.

158.   Plaintiffs and the Classes justifiably relied on Defendants' skill and judgment as manufacturers of nutritional supplements in formulating Testosterone Boosters.

First Amended Class Action Complaint

159.   Testosterone Boosters do not significantly increase free testosterone levels, in breach of the implied warranty of fitness for a particular purpose.

160.   As a direct and proximate result, Plaintiffs and the Classes have sustained damages equal to the amounts paid for Testosterone Boosters.

**SEVENTH CLAIM FOR RELIEF**
**NEGLIGENT MISPREPRESENTATION**

(Against All Defendants)

161.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

162.   Defendants' representations that Testosterone Boosters have been clinically proven to increase free testosterone levels, set forth above, are representations of fact.

163.   Defendants' representations that Testosterone Boosters have been clinically proven to increase free testosterone levels, set forth above, were false when made.

164.   Defendants' representations that Testosterone Boosters decrease body fat, and increase muscle size and strength, set forth above, are representations of fact.

165.   Defendants' representations that Testosterone Boosters decrease body fat, and increase muscle size and strength, set forth above, were false when made.

166.   These representations would have been material to a reasonable person in deciding whether or not to purchase a Testosterone Booster.

167.   Defendants made these representations without reasonable grounds for believing them to be true.

168.   Defendants made these representations with the intent to induce Plaintiffs and the Classes to purchase Testosterone Boosters.

37

First Amended Class Action Complaint

169.   Plaintiffs and the Classes justifiably relied upon Defendants' misrepresentations by purchasing Testosterone Boosters.

170.   As a direct and proximate result, Plaintiffs and the Classes have suffered damages equal to the amounts paid for Testosterone Boosters.

**NINTH CLAIM FOR RELIEF**
**VIOLATIONS OF ARIZONA CONSUMER FRAUD ACT**

(Against Truderma)

171.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

172.   Truderma's representations, set forth above, that Troxyphen and Troxyphen Elite have been clinically proven to increase free testosterone levels constitute "advertisements" as defined in A.R.S. § 44-1521(1).

173.   The Troxyphen and Troxyphen Elite purchased by Plaintiff Torres and the other members of the Troxyphen Class are "merchandise" as defined in A.R.S. § 44-1521(5).

174.   The purchase of Troxyphen and Troxyphen Elite by Plaintiff Torres and the other members of the Troxyphen Class constitute "sales" as defined in A.R.S. § 44-1521(7).

175.   Truderma's representations, set forth above, that Troxyphen and Troxyphen Elite have been clinically proven to increase free testosterone levels are false, and constitute unlawful practices as defined by A.R.S. § 44-1522(A), which proscribes "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact . . . in connection with the sale or advertisement of any merchandise . . . ."

176.   Truderma made these false representations with the intent that others rely on them.

177.   In purchasing Troxyphen and Troxyphen Elite, Plaintiff Torres and the other members of the Troxyphen Class relied on Truderma's misrepresentations.

178.   As a result of Truderma's violations of A.R.S. § 44-1522(A), Torres and the other members of the Troxyphen Class who purchased Troxyphen or Troxyphen Elite in the State of Arizona have suffered damages, and seek actual damages equal to the amounts paid by them for Troxyphen and Troxyphen Elite, punitive damages, reasonable attorneys' fees, and costs.

## TENTH CLAIM FOR RELIEF
## VIOLATIONS OF UNIFORM FRAUDULENT TRANSFER ACT
### (Against Truderma and Gardineer)

179.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

180.   The claims asserted against Truderma in this action and in *Bitton, et al. v. Gencor Nutrients, Inc., et al*., C.D. Cal. Case No. 2:14-cv-03754-DMG-E ("*Bitton*") filed on May 15, 2014 are "Claims" within the meaning of NRS 112.150(3).

181.   Torres and the Troxyphen Class are "Creditors" of Truderma within the meaning of NRS 112.150(3).

182.   Plaintiff Michael Sokolove ("Sokolove") and the Troxyphen Subclass in *Bitton* are "Creditors" of Truderma within the meaning of NRS 112.150(3).

183.   Truderma is a "Debtor" within the meaning of NRS 112.150(6).

184.   Gardineer is an "Insider" of Truderma within the meaning of NRS 112.150(7)(e).

185.   Gardineer is a "Person" within the meaning of NRS 112.150(9).

186.   GNC consistently sells over $700 million per year in "sports nutrition" products, including Troxyphen and Troxyophen Elite, which GNC began selling in February 2013.  As set forth above, a nationwide radio commercial for Troxyphen, which has aired thousands of times, states that "Troxyphen is *GNC's best-selling*, 100% natural and most powerful testosterone booster."  Accordingly, Truderma has likely received tens of millions of dollars in revenue from the sale of Troxyphen and Troxyophen Elite.

187.   On May 14, 2019, Truderma's counsel David R. Koch, stated in an email to Plaintiffs' counsel that "Truderma has no money."  On August 26, 2019, Mr. Koch sent Plaintiffs' counsel another email, stating again that Truderma "has no money" and lacks even the funds necessary to meet its obligation to pay its counsel to represent it in this litigation.  Accordingly, Truderma is "insolvent" within the meaning of NRS 112.160, as the sum of its debts is greater than all of its assets at a fair valuation.

188.   Truderma transferred all of its funds to Gardineer with actual intent to hinder, delay, or defraud Torres, Sokolove, the Troxyphen Class, and the Troxyphen Subclass.

189.   Truderma transferred all of its funds to Gardineer without receiving a reasonably equivalent value in exchange, and made these transfers while engaged in a business for which its remaining assets were unreasonably small in relation to the business.  Truderma intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they become due.

190.   Truderma transferred all of its funds to Gardineer without receiving a reasonably equivalent value in exchange, at which time Truderma was insolvent or became insolvent as a result of the transfers.

First Amended Class Action Complaint

191.   Pursuant to NRS 112.210, Torres seeks avoidance of the foregoing transfers to the extent necessary to satisfy his claims and the claims of the Troxyphen Class, and an attachment or garnishment against the transferred funds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.     For an order enjoining Defendants from continuing the fraudulent business practices and false advertising alleged herein;

2.     For an order restoring to Plaintiffs and the members of the Class the amounts wrongfully acquired from them by Defendants;

3.     For compensatory damages, according to proof;

4.     For actual damages, according to proof;

5.     For an order, pursuant to Cal. Civ. Code § 2224, imposing a constructive trust upon the assets of NDS acquired by means of the wrongful acts alleged;

6.     For punitive or exemplary damages;

7.     For attorney's fees and costs, as allowed by statute and Cal. Govt. Code § 1021.5; and

8.     For such other and further relief as the Court deems just and proper.

First Amended Class Action Complaint

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all claims so triable.


Respectfully submitted,


Dated:  September 10, 2019        <u>\s\ *Barry Himmelstein*</u>
                                   Barry Himmelstein (SBN 157736)
                                   barry@himmellaw.com
                                   HIMMELSTEIN LAW NETWORK
                                   2000 Powell St., Suite 1605
                                   Emeryville, CA 94608-1861
                                   Telephone:  (510) 450-0782
                                   Facsimile:  (510) 924-0403

                                   *Attorney for Plaintiffs*

First Amended Class Action Complaint

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 10, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Barry Himmelstein*
Barry Himmelstein

43
First Amended Class Action Complaint